Case No. 19-54-8 at L. American Hospital Association at L. This is Alex Azar, II, with additional capacity as the Secretary of Health and Human Services at L. This line is for the appellate and this is for the ambulance. This line is for the appellate and this is for the ambulance. The premise of the District Court's ultra-virus ruling is that the Medicare Trust Fund is compelled to overpay the group of hospitals, we're calling 340B hospitals, unless HHS collects their cost acquisition data in the form of a survey. Even before getting into the weeds of the statutory text that governs, that should sound improbable based on the big picture undisputed points about how the OPPS system works and how these rates fit in. Two key points. One is that there's no dispute that this annual rate setting for these drugs is subject to the same overarching budget neutrality requirement as the rest of the OPPS system and that's explicit in paragraph 14H. It's the very last page of our addendum, very last paragraph at the bottom. So that was when this issue, when this case was before this court previously, that was not so clearly and unequivocally stated by counsel for the government. The question that I think was left open a little bit was whether HHS really believes that it's bound by budget neutrality to the extent that if it accomplished savings under drug pricing, under a theory like that used here, would it in fact have to redistribute those within the program or could it retain those for the government to make the entire program cheaper? So the point was actually clarified in the 28-day letter that was either submitted the same day as the last oral argument or perhaps the following day, was under that H provision, there's no question that when HHS is doing the rate setting process year after year, that it is bound by the budget neutrality requirement. It could not just say I'm reducing these particular rates to average sales price minus 22.5% and period, doing nothing else. The question not resolved then and still not resolved would be, well, what if despite the express preclusion of review provision and, as I'll go on, the clear authority to make this rate reduction, a court nonetheless were to say I don't care, I'm invalidating it anyway and then we're in the quagmire of remedy where we've never been before and so that I don't want to get out ahead of the agency which was required to take comment on the issue and it's done so. But just the basic point, and I think the plaintiffs recognize this on page 29 of their brief, including the footnote on that page, the basic point is that when HHS is doing its annual job of setting these outpatient prospective payment system rates, you know, year after year, there's nothing special about these rates under paragraph 14H. They're explicitly subject to the budget neutrality requirement and, as the plaintiffs actually point out in the footnote, that said a second time in paragraph 9 itself refers to paragraph 14. So Congress has said this twice with respect to the varying types of rates at issue here, these paragraph 14 rates. And what was your second point? Because that was your first point. Okay, so this is one. So I just want to make sure we understand how we fit in. And the other is about Medicare beneficiaries themselves because, of course, the Medicare program is one for their benefit. There is no dispute that the usual statutory 20% coinsurance rate applies to these rates and that's tied to the Medicare payment. So the obvious problem that arises if Medicare is paying out at inflated rates is that the Medicare beneficiaries are now being asked to pay very inflated coinsurance. And the inspector general, and we cite this in our brief, found that for some of these drugs, the beneficiary's coinsurance alone was greater than the entire acquisition cost for the drug. And when you think about the types of drugs we're talking about here, like cancer treatment, as the commenters pointed out, that could mean the difference for a beneficiary between being able to afford the treatment and not being able to afford the treatment. These are expensive drugs that are often administered repeatedly. So this is the big picture framework. And now if you look at the specific language, and I think this is where the district court just got a little tangled up, this is now the actual what we call subclause 1 and subclause 2. One has to do with the survey and the other is the proxy to use when you don't have a survey. So this is in our appendix. It's the A3 at the bottom. Now, we're talking about, so stepping back just briefly for one second. The whole provision that we call T, that's the entire outpatient prospective payment system. T2 says set up a classification system. T14, which is we're now in that universe, says and here's how you're going to do it for certain drugs. And they're basically drugs where the Medicare payment isn't packaged with the payment for the medical procedure, but it's paid separately. I'm oversimplifying a little bit, but that's the basic idea. And these were also drugs that were relatively new to the market, so that the concern was their cost wasn't being captured by the older proxies. So what Congress did was it said to GAO, do a survey of hospitals generally and try to figure out the average acquisition cost by a drug, figure out if it varies by category of providers. So think teaching hospitals, urban hospitals, large hospitals, that kind of thing. Use that to set the Medicare payment rates initially and also give advice to HHS to say, like, what should you do about a survey in future years? Can I back up and ask you one thing? Yes. Is 14 establishing a classification system? Yes. If you look at the bold right next to paragraph 14, drug APC payment rates, that acronym, ambulatory payment classification, that is a classification. So that's what I'm saying. So 14 is doing something with a classification, but it's not developing a classification system. It's in the meaning of 2. Well, it's the 2 tells HHS, develop a classification system. 14 gives more specific instructions for how to do that when you're talking about drugs. Well, it's how to set rates for particular things, since I'm classified. Well, the classification, you actually have to go to the CMS website. It's line after line of code. It's massive. So, you know, you can give it, like, again, I'm oversimplifying, but, you know, hernia, like that kind of thing. It's very subdivided. Right. What happens under 14 is rate setting for a particular class or classes. It's not the classification system. Is that right? I'm not sure I agree, but I'm also not sure it matters. So I'm happy to call it rate setting and that this is the – I just want to make sure I understand. So every time you set a rate, that's a classification? If you determine how to group things, that's a classification. But things are not grouped. I mean, that's the difference, really, between 2 and 14. 14 is a per drug for the drug. Well, or grouping of drugs. I'm sorry, for what? Or grouping. The drug for that year. The average price for the drug in the year. So I might be able to help, like, avoid this issue because I don't know that anything does turn on it? I thought the jurisdiction stripping turned on it. I thought that was how you get there because the jurisdiction stripping provision mentions 2 and mentions 9 but doesn't mention 14. And I thought your whole theory about how jurisdiction is stripped over the Section 14 question depends on understanding 2 as the umbrella that encompasses 14. It's a piece of it, but it's not necessary to focus on the classification language because 2 speaks of adjustments, 9 speaks of adjustments, and 14 cross-references the 9 adjustments. So we can just assume for purposes of this case it's not a classification and we're just talking about rates and rate adjustments. Actually, we're just talking about rate adjustments. For the moment, we can talk about, yes, rate adjustments. And I just want to make sure, even though I know I'm focusing on a merits issue because of the way the district court rules, it's very important to understand the merits issue in order to understand the error in the ultra-high rates ruling. And I will come to the alternative theories that the plaintiffs are offering about jurisdiction, but I just want to focus on the central issue. So going back to, so Congress said, you know, do this survey, and that's the GAO 2006 report is its report on the survey. And it did the survey, and it made some findings like teaching hospitals seemed to pay a little bit less, but it included an important caveat, which is that the survey data that they got in, and this isn't about 340B in particular, but it didn't include rebates. So there were systematic problems with the survey data. And neither GAO nor HHS concluded that the data were useful. And so HHS went to the proxy right from the start. The proxy, this is subclass 2, and basically Congress, anticipating that there might be issues getting survey data, said, you don't have survey data. I'm giving you essentially a choice of proxies for average acquisition costs. And the one that's borrowed, this cross-reference to 1395W-3A, that's just the reimbursement rate under the Physician Fee Schedule. And for many drugs, and, you know, acquired by many hospitals, that's a perfectly fine proxy for average acquisition costs. That's the Inspector General's finding that when you're outside the universe of 340B, it's only varying by about 1%. So there's been no particular reason to, what we're getting to now is the next language, to adjust that because there's no systematic problem with using that as a proxy for average acquisition costs. We're now here in the particular overlap between Medicare reimbursement and the separate 340B program. It's not a Medicare program. Many of the providers aren't serving Medicare patients. They're not being reimbursed under this scheme. But for the particular overlap here, when what you're talking about are certain hospitals that are both getting the big discounts from the manufacturers under 340B and serving Medicare patients, the question is, is there some clear prohibition on HHS taking undisputed findings from independent agencies about the drug ceiling prices under this 340B program and using that, again, you know, uncontested information to make what was a conservative downward adjustment of the reimbursement rate. Can I ask you this question? So if it's okay for the government to go straight into sub 2 on A3 in the way that you're describing it, would this be okay? So if you look at A5 and Romanet 3, which deals with the survey requirements, when the surveys are conducted, it says, the survey conducted under clauses 1 and 2 shall have a large sample of hospitals that is sufficient to generate a statistically significant estimate of the average hospital acquisition cost for each specified covered outpatient drugs. So in the situations in which surveys are used, that's the way that the surveys are going to be formulated, according to what Congress said. So could HHS say, you know, we are going to use surveys because we want to figure out what the average acquisition costs are. But we're just not going to have, and we're going to use hospitals. We're going to use a sample of hospitals. But we're just not going to have a large sample of hospitals that's sufficient to generate a statistically significant estimate. That's the part we're not going to do. And that's okay for us to do because we can just do that by going to sub 2 on A3. I'm going to answer, but I want to make clear. I'm answering what's okay for the agency, not what the courts get to review. So come back to reviewability. I just want to make sure anything I say about what HHS is supposed to do is not a concession about whether the court gets a comment to review it. So, no, the clear import is that you're supposed to be using reliable cost information. I'm not aware in general, if you look back at that 2006 year report, of some other mechanism for getting reliable acquisition cost information about, say, you know, teaching hospitals or urban hospitals, other than a survey, and, like, other than doing a statistically valid sample. The unique thing about these 340B hospitals is that the inspector general had the HRSA drug stealing data. It had, just in that particular context, an independent source of reliable information not contested in the rulemaking. So we're not suggesting that, in general, it would be appropriate for the agency to say, I know Congress wanted us to use a statistically valid sample, but I'm just going to pick, you know, 100 hospitals, even if it's not statistically valid. And, of course, we've never done that. It might be arbitrary, but based on whether it's consistent with the statute, if HHS said, we're just not going to do exactly what's spelled out in Roman F3, but we're going to do something that we think is pretty close. Now, you're saying this one is still valid because you have the data somewhere else and that the reliability of the data shouldn't be questioned. For the purpose of this question, I'm willing to assume that. But could the agency say, we want to conduct surveys, and we're not able to do what this says, but we're going to try to do something that's pretty close, we think is close enough. Now, we know that's not consistent with the text of the statute because it's not a large enough sample of hospitals that's sufficient to generate a statistically significant estimate. But we want to do this anyway. We want to do a survey, and it's going to be based on a sample of hospitals. And we can do that, even though we can't do that under one. I assume you agree you couldn't do that under one. Correct. And then, so you'd have to go under two. And would that be okay? Yeah, I mean, we're assuming another valid, you know, reliable mechanism for getting information about average acquisition costs, yes. Because, again, remember, the touchstone here is these rates, and this is going back to 2E, are supposed to be equitable. And that means equitable among providers and equitable to beneficiaries so that they're not overpaying their co-payments. We have a specific separate provision in 14 that's going to drug pricing, and you say throughout your brief that the purpose of 14 is to align Medicare payments with average acquisition costs, again and again and again, without citation. And when I – so I assume you're referring to just the text of the statute. But when I read the text of the statute, I see two alternatives. One – and this is just another way of putting, I think, Director DeBasa's question – one, average acquisition costs obtained in a particular rigorous way. Or if you don't have that, where actually the touchstone is no longer average acquisition costs. As I read just the text here, if that data, particular rigorous data, is not available, sample size, then what we're interested in is something different, the average price for the drug, the average sales price. And the question is, nobody disputes that there isn't the data that Roman 1 requires. So why isn't the different terminology of Roman 2 just open and shut on the merits? And this is assuming that we were to get to the merits. And I see that your conception of the statute is, well, it's all about approximating average acquisition costs. But I'm not sure where you find that. Okay, so Clause 2 doesn't just say, use this proxy, period. It says, use it and adjust it as necessary for purposes of this paragraph. And the overriding purpose of the paragraph, we know from Clause 1, is to reinforce size. Again, you're assuming the conclusion. No, I am saying that the overriding purpose of the paragraph is to come up with ambulatory payment classification rates for drugs. No, but it's saying, and how do you do that? Congress has made it unambiguously clear that you're supposed to be targeting average acquisition costs. If the particular rigorous form of average acquisition cost is not available, you're supposed to be targeting the average price for the drug in the year established. And I thought the cross-section was about overhead costs and, you know, the primary source of a need to adjust would be some kind of overhead cost. Not to flip back. I mean, you could see the statute of Congress, not what you thought. You could see the statute saying the average acquisition cost either determined by the survey or average acquisition cost approximated by looking at average sale price and other data, partial data about acquisition costs and trying to adjust the sales price accordingly, which I think is how you're reading the statute. Well, first I'm going to address the overhead point. Overhead is addressed separately. That's right in that little III provision, in a subsequent year shall be equal subject to subparagraph E. Subparagraph E is the separate direction to study overhead and make adjustments for overhead. That qualifies both little I and little II. The adjustment, so, you know, there's, of course, Congress isn't just pulling out a thin air. Congress is trying to give a proxy for average acquisition costs because nobody's supposed to get overpaid systematically. So is that the point? Because I think what Bill is getting to is it would be much tidier for your explanation if 14 had, before capital A, had, you know, a general purposes provision that says the purposes of the acquisition are to figure out what the acquisition costs are. And then you would say, well, okay, then when you don't have, when you can't calculate acquisition costs with the statistically valid survey and the way that Congress contemplated, you're still trying to get to acquisition costs. We're going to use price as a proxy. But obviously what we want to use price, when we use price as a proxy, we want to get it as close to acquisition costs as possible. So if you have to make adjustments to get it closer to acquisition costs, do that. And if that's the way the statute read, then, you know, you'd be even more well served. And then the question is, if it doesn't have that kind of overarching principle at the beginning that says, by the way, what you're trying to do with the rates is get them as close to acquisition costs as possible, then where do you get the understanding that really what sub tubes reference to price is about is to try to get closer to that, to get as close to acquisition costs as possible. We're getting it from two places. The narrow place is that, you know, Congress is preferring that these rates be set at average acquisition costs. How do we do that? Because that's from clause one. Okay. Okay. The broader point. The first. Yes. The broader point, and it's first and mandatory. It's not discretionary there. The broader point is the one I started with, which was once you understand how these rates fit into the OPCS system, why would you possibly think that there's some, you know, penalty where you have to systematically overpay a category of hospitals despite reliable cost information. So the overpayment part is it does seem compelling except when you think about the way the whole system is framed, which is, I mean, there may be all kinds of hospitals that are getting discounts, volume discounts, rebates, whatever, and this pricing system isn't really set up to sort of nuance, calibrate, ebb and flow. Depending on that, it's setting the average acquisition cost for the drug, which may vary by hospital. Right. It's under one. Well, and this is actually also an overarching principle, under 2E. It's explicitly, this is what I mean by classifications. Again, to make these fair, you don't have to just lump everybody together if one group is paying a lot less than another group. That would not be an equitable system, and equity doesn't go out the window just because you're not looking at E, the startup stage, but at 9, the annual revisions to the OPCS system. And the E, what are you pointing to for E that would allow a change in the price that's set under Roman 2, Romanet 3, Roman 2, for subcategories of hospitals? You're talking 2E, not 14E. I'm sorry, 2E. Oh, you're talking 2E. I'm sorry. A is one of our addendum for safety addendum. But 14, Romanet 3, 2, talks about adjustments by the Secretary of State for the purpose of this paragraph. Yes, but this is, again, my big picture point. The purpose of this paragraph is no different from the general purpose of the OPCS system, which is to set fair rates that compensate for the average acquisition costs, whether it's a service, a service. But in paragraphs 13 and 18, when Congress wanted to treat an adjustment under those paragraphs as an adjustment under 2E, it said so expressly, and that language isn't here. Congress, this part is recognized. There are lots of inconsistencies and redundancies in the Medicare statute, as the Court pointed out in Mercy Hospital, which is wholly unsurprising given the complexities. Here, Congress – These are later editions where Congress is actually much more focused on what it's doing. It's not writing the whole frigging statute. And then it comes in and it puts some adjustments and says, those are 2E adjustments, and then it creates this 14 thing, and it doesn't say that. And we're supposed to go, they didn't know what they were doing after our rule of statutory construction? Okay, this was the argument rejected in Amgen. Amgen came in and said, we're entitled to a pass-through payment under 6. 6 comes after 2. There's no cross-reference to 2. And this Court unanimously said, that doesn't matter. The 2E equitable adjustment authority carries through and allows the adjustment of the 6 pass-through payments. This is unsurprising, and this is the slightly longer answer for getting to 2. 14 does explicitly cross-reference 9. All 9 is doing is saying, keep reusing your same adjustment authority year after year when you're revisiting the OPGS system rates. So, if you want a cross-reference, you've got it in 14H. Cross-reference to 9 is for 2004 and 2005 when they had a specialized process. No, Your Honor, keep reading. Read the last page of the addendum to our release. Okay? What shall be taken into account for subsequent years? So, it's applicability of expenditures and determining, it's not inapplicability, it's applicability for now, right? It's doing two things. So, the background general rule is, of course, when you're adjusting these rates, you're acting under paragraph 9. That is the authority that has HHS year after year adjust the entire OPGS system. There's a special rule for the first two years. No longer relevant. Right, which is like, okay, you don't have to worry about budget neutrality for 2004, 2005, but you do for all subsequent years. But that's the budget neutrality point, which doesn't really drive one way or the other. It supports your policy argument that it's actually better to reimburse from 340B drugs at a lower rate because, voila, then we have more money to pass around. Right. It does support that argument. It's not just that, though. It's also the budget neutrality is 9B. That qualifies the adjustments that are being made under 9A. And what's happening under 9A is take what you did under 2, you know, at whatever start-up point for any particular rate, and keep revising it. Keep thinking about it. Look at new cost data. That's why when I'm saying the equitable adjustment authority doesn't fall out after you set the rate the first time. It gets exercised every year, whether it's specifically invoked or not. That is part of what the agency is doing. In Indiana, they said they were making the adjustment under 2E. They didn't say they were making an adjustment. In here, they're making the adjustment under 14. That's what the agency said. It did not say it was making it under 2 or 9. It said 9. It said in the beginning of the rule, it said, here we are doing our 9 adjustments. That's everything. It also invoked the final rule. We quoted the language in our reply brief, and it's the very start. That's in the preamble, right? In the preamble, yeah. And we quoted the language. But it's also, like, this is what they're doing. They're doing, this is, you know, the Sisyphean passive. Each year, you have to, like, process mind-boggling amounts of data and come up with a revised OPPF system. But in the part of the rule that deals with 340B, there's no reference to 9. There's only a reference to 14. Okay. No. No? No. Well, when you say it goes to 340B. So, Paragraph 14 is not about 340B in particular? No, I know, but the rule part. Oh, oh, just in the subsection. Well, of course, because they're talking about the specific rates and, yes, they're referring to the specific authority within, you know, 14, that Clause 2. But the outset makes clear, this is our general point, all of this is an exercise of the Paragraph 9 authority, and that's what the agency says right up front. And it would be true even if the agency didn't have the citation. That is this enterprise that they do every year. I mean, it is complicated, and you're doing a great job in trying to make it clear. But when I look at 9 and you say, well, 9 also applies to 14, it does say, just as described in Paragraph 2. So, we do have to be on board with your initial characterization of what's going on under 14 as a subset within the umbrella of 2, right? We have to be with you on that in order for your argument to hold together, right? Well, 14 cross-references 9. Right, but 9 cross-references 2. There would be no reason to cross-reference 9 if Congress didn't understand that, of course, this is a subset of your 9 authority, which is what you do each year to exercise your 2 authority. Not necessarily. You can have two categories of things, the Section 2 category and the Section 14 category, and they're all on the table for purposes of budget neutrality, but they're actually two different projects. We just, like, it doesn't, we don't think it makes any sense to think of it that way because what the agency has to do, and maybe there is a big picture of why 14 was pulled out. 14 was pulled out because Congress said, I want an additional classification system for drugs because their acquisition cost data, we have reason to think, aren't captured in the existing data. So, you know, again, these are just drugs newer to the market, and so you wanted more recent data, and that's why they said go do a survey, figure out what is the average acquisition cost for these drugs. And there's no question that's what Congress wanted. Congress just didn't anticipate that it was going to be very hard to get accurate data from Congress. But they're doing it. The agency's doing it now, right? So they're doing it for 340B hospitals. Right. You can get it. So discounts are at the front end. Those are relatively easy to report. Rebates are at the back end and are much more complicated. It might not be for a drug in particular. It has to do with bundles of drugs. That's between the manufacturer. But you're doing it now. So it's not a question whether you could have done this survey. It's whether you could have done this without doing the survey. You may have had maybe problems with doing a survey for everything in this area, but because this is targeted to a specific hospital group. No, no, of course that's right. And, you know, if necessary, then the agency, if it were really told, you have to come up with a remedy to say, all right, we'll use the survey data. So that could be years down the road. The question here is, is there a prohibition in this statute on using data that the reliability is uncontested and the price adjustment is conservative in order to be able to then spread that money to other providers and stop Medicare beneficiaries from having to pay these inflated co-insurance payments? Can I ask this question about the preclusion to review the nesting of all these provisions? I mean, obviously it would be a lot better if 12 specifically referred to 14. It would be very straightforward if 12 referred to 14. If Congress had kept up to date in the way that they had in the past when they added a provision, they would specifically fold it into the limitation of review provision. They could have done that with 14. They didn't. Your argument is they didn't need to because it was just an exercise of 9, which is already there. I get that. And then in solidifying the notion that this is just an exercise of 9 authority, you're relying on 14H, which cross-references 9. And also 9B cross-references 14. Okay, so if 14 didn't have H at all, because from years past, 2004, 2005, H is only saying what you already assumed to be the case. Well, the reason we assume to be the case is because we know it's an exercise of 9. Well, that's the question. So if 14 didn't have H at all, you'd be making the exact same argument. You'd be saying it's absolutely obvious of 9. And you agree that there's a general principle out there in the world that says we don't lightly assume there's a preclusion to review. So it has to be pretty clearly stated. Not here. This is where I want to come to why DCH regional, just the general point, that this doesn't leave room for ultraviolet review and why you don't take apart the preclusion provision this way when you understand what Congress was actually trying to do with the preclusion provision. What Congress was doing with this preclusion provision is saying, I, Congress, amend this statute, this OPDS statute, the whole thing, all the time, practically every year. I'm in a much better position than the courts are to decide whether a course correction is needed and to oversee it. I can put more money in. I can authorize exemptions to budget neutrality. I'm going to take care of that. And so Congress said for basically what are all the cross-cutting issues, the classification and the conversion factor and the periodic adjustments in which you revisit the entire thing, like all the big-ticket items, it said, courts, stay your hand. I've got this. And that's why the problem that was just the dictum in Amgen that was later clarified in DCH regional is like, no, this is not where you then as a court essentially engage in a mini-merits inquiry in order to decide whether the preclusion applies. For my purposes, it would be helpful to just put aside the ultra-virus argument and look at the statutory argument, because I think that's what the question was asking about. It's really the... No, I understand, and this is why, so if the court wants the textual provision that's most on point, it's the reference to Paragraph 9. We also think 2 is indirectly incorporated because... Go ahead. Well, just because when HHS is exercising its annual 9 authority, it is also exercising its 2 authority, but the shortest path textually is the reference to 9. Which is a reference to 6, but it's everybody... Yeah, everyone agrees that 6 should be 9. And you said 9 references 14, but that's the one that's only confined to 2004 and 2005, or is there another place? I'm looking at 9b. Yeah, 9b. I'm sorry, we didn't quote this part in our brief, but it's quoted on page 29 of the appellant's brief. But I'm going to fill out the poll. Just make sure I have the right language. They're the reference to... It's actually a very narrow reference to 14. If I read it, it's only for 2004 and 2005, and not in 9, so 9b. So what it's doing, okay, and does the court have the whole statute? Did you have the full 9? I thought so. That's what I'm telling you. Okay, all right. Our addendum is missing some of the key language on this. That's why I said... I'm sorry. So, all right, so 9a, periodic review. This is saying what HHS generally, across the board, should do every year, review and revise various things, including the paragraph 2 adjustments, to take into account all sorts of things, including new cost data. 9b is the budget neutrality adjustment, and that applies when the secretary makes adjustments under subparagraph a. That's the one I just read. And then it goes on to say, and this is the language that I should have included, don't worry about budget neutrality for 2004 and 2005. The only reason... No, it's paragraph 14. What's the only reference to paragraph 14 in 9? Yes, but this... So, implicit in that is that when you're making the paragraph 14 rate changes, you're exercising your paragraph 9a periodic review authority, because that's the first sentence. If the secretary makes adjustments under subparagraph a, you don't have to worry for two years about the paragraph 14 payment. Implicit there is you do have to worry going forward, and that's explicit in 14h. But there's no question, the only reason... It's a budget neutrality, but it doesn't mean that the adjustments that are being made are 14 adjustments. 14 has its own adjustments. No, but it's saying if you're doing your annual thing, which is the 9a annual adjustment, to start thinking... 14 has its own adjustment authority. Right. That's the thing. If you have a universe of 14 and a universe of 2, then 9 is saying adjustments under subparagraph a, which specifically talks about 2, may not cause the estimated amount of expenditures to increase or decrease. It has to be budget neutral. Now, adjustments under 14, they're different. They may be, according to the respondents, a little bit narrower, more limited. So each universe is going to be adjusted. And then this provision 9 is saying adjustments under a, meaning adjustments to 2, shouldn't be non-budget neutral because it's a broader, more open-ended adjustment authority. And then it's taking... But you're saying it's not taking 14 as a given. It's talking about adjustments that encompass 14 in language that you didn't provide it. Well, I'm just saying... First, go back to Amgen one more time. Remember, the argument in Amgen was the 2e adjustment authority doesn't apply once you get to 6 because there's no reference to it. And this court said, sure it does. So the same logic, the 2e adjustment authority applies in the same way to paragraph 14 as it did in Amgen to paragraph 6. But this is where I worry about getting lost in the weeds. It also was paragraph 14 and it's of a different character, I think, is what... Well, no, that was the Amgen argument. The Amgen argument was paragraph 6, also about drugs, prescribed with specificity, a formula for making additional pass-through payments for certain drugs. And what Amgen argued was that specificity isn't qualified either explicitly or by cross-reference to paragraph 2e. Therefore, there's a want of authority. Sorry. Did it have its own sort of adjustment provision that was relevant to what they were doing there? It did not have a broad adjustment provision. It had a narrow adjustment provision. But it wouldn't have covered what they were doing there? No. Because what happened in... Yeah, because what happened in... Yeah, well, what happened in Amgen was the conclusion that, you know, yes, Amgen's drug was otherwise entitled under the formula to the extra payment, but Medicare, there was another drug that was maybe not quite as good, but good enough, much cheaper, and therefore, HHS just eliminated Amgen's pass-through payment. And this court said, that's fine, that's an equitable adjustment because it's equitable writ large to the Medicare system not to be overpaying for a drug that's not much better, you know, than another one. I guess if there's been some claim here that you were not applying, you were not making an adjustment under Rule 14, but in fact, in this case, as happened in Amgen, the agency had said, we're making an adjustment under 2 or 9 or both, then you would fit that scenario. But here, what the agency said is we are doing a 14, lots of other stuff, 2, big Roman 2, 14A, whatever, 3, 2, that's where we're doing the adjustment, we're doing that specific type of adjustment here. The agency cited 9 globally. In the preamble to a multi-hundred page rule, it was covering all kinds of rates, but it never mentioned that power in making this adjustment. It does need to cite 9 every time it goes through one of the specific rate-setting procedures. If it says we're exercising this adjustment, it seems to me what your argument is, the agency said we're exercising this 14 Roman, big Roman 2 adjustment power. This is the muscle we're using. And then the argument here in court, not in the Federal Register, are, well, actually what they meant when they said it is we're doing that muscle, but we're also using our adjustment powers under 2 and 9. Am I understanding your argument correctly? No. So first, remember, these Federal Register notices aren't written for the purpose of judicial review because there's a preclusion provision. Everybody in the community understands that these are the 9 annual adjustments, in a big sense. Everything the agency is doing here is under paragraph 9. There are lots and lots of subsidiary paragraphs that also get invoked that doesn't take it out of the overarching introductory... What is your evidence that that's what everyone understands? You don't claim Chevron or anything here. So what is your evidence that everybody knows that even though they said 340B, or 14.2, that's the type of adjustment we're making. That's the specific, it's a specific statutory form of adjustment, and that's what we're doing, that everyone knew we were also exercising our statutory muscle under 2 and 9. Well, they did cite 9. In the preamble. Well, it's all in the preamble. So it's just saying, yes, in the broad introduction where they said, what are we doing right now? But they talked about 14.2 in the 340B decision. Yes, and we talked about the merits. They have authority under 14 to adjust the proxy in order to bring these payment rates in line with acquisition costs. That's clearly what they were doing in the narrow sense. But for preclusion or review purposes, the court asked, how do we get from 14 to 9? And I'm just explaining that this is just one of many, many types of more specific adjustments that fall under the umbrella of 9 as well as the specific adjustments. But there's some adjustments that, specific adjustments, that don't rely on anything other than 9, right? So elsewhere in the rule, you wouldn't, in other words, it's not as if the way the statute is constructed is everything is an exercise of 9. And I'm just leaving a 2 aside for now. Everything is an exercise of 9. And that's what we're going to say in the preamble. Because obviously we're talking about 9. And then for every adjustment that we talk about later, we're going to invoke a specific source of authority that's below the overarching rubric of 9. Because there's some things for which there's not a below part at all. There's some things for which 9 itself is an issue, right? There are some provisions, like paragraph 6, that might not have relevant adjustment authority, but you can still use your overarching, HS can use its overarching authority under 9. And when I say this is a, I mean this rate setting, this whole endeavor where you go through notice and comment and, you know, you get tons of data and you revisit it, that's just the exercise of the instruction periodically reviewing revised work again. But practicing a group of a whole bunch of stuff together in one big federal register notice doesn't really address what power was being exercised for a particular adjustment, does it? Well, I'm not sure we're disagreeing because we agree that 14 itself says adjust the proxy as necessary for purposes of the paragraph. Which may not be the same as an equitable adjustment under 2. Well, equitable is a cross-cutting objective. This is, again, we're going back down to these rates are all budget mutual. For purposes of this paragraph it's not necessarily the same thing as equitable. It doesn't mean inequitable. It doesn't mean inequitable. Well, there's a world filled with a lot of things between those, and so someone could decide this is what, it actually may look inequitable to you, complaining party, but in fact that is what the purpose of this statute is. And I think that would be a perfectly legitimate agency answer that you would defend. It doesn't have to meet some definition of being equitable to still be legitimate necessarily under Rule 14 as long as it's advancing the purposes of this paragraph. Right? Well, I mean, equitable is not defined and I'm not aware of any limitation on it given the way it was read in Amgen. But here... If all these adjustments were automatically, everything under, this type of adjustment under Roman 2, is automatically an adjustment under Rule 9, why did they have to add the cross-reference to budget neutrality? There was no need for that language because everyone knew it was just a 9 adjustment which already requires budget neutrality. I agree. They didn't need it, but what they were primarily doing was making an exception for the 2004-2005 year. They could have done that in 14 just like they did in 9. Right? They could have done, just stopped. In 9, they just stopped after 2004 and 5. Don't worry about budget neutrality. They could have said the same thing in 14. Right. But in fact, they felt a real need to tell us that 14, sorry, but I'm just trying to finish my thought here, that the Rule 14 adjustments themselves will be subject to budget neutrality which seems to me entirely redundant statutory language if everybody in the world knows that we're already doing a Rule 9 budget neutrality going forward after 2005. This is, I want to go back to Mercy Hospital. There is lots of redundant language in the Medicare statute. How are we supposed to do statutory construction with that? Well, you're not. There's a preclusion or review provision. These are instructions to HHS and the program people who have to do this. That seems to be a bit circular because we're bootstrapping because you say the reason we, even though you're not listed in the preclusion of review, we know you're there because things are listed and everybody knows that those listed things are the same things that aren't listed because ignore rules of statutory construction. So I don't think it's quite right to say that they just threw a couple numbers in and left everything out because we would figure out that by putting a couple of paragraphs in and leaving everything out, they actually meant everything is in and we have no authority. Your argument isn't working for me in that regard. 14 cross-references 9 and 9 is,  are appropriately precluded. Can I ask this question? The 14H is the cross-reference to 9. Yes. And the purpose of that is to say to carve out 2004-2005. That seems to be what's centrally going on. I think that's the driver. That's the driver. And then 9B also carves out 2004-2005. Yes, which is redundant. So I just wanted, so 14H is unnecessary. It just makes more clear what already would have been, in other words, the same arguments would apply under 9B. Yes. So 14H. As I'm saying, the Medicare statute has a lot of redundancy. And this Court made that point. But it's only redundant. It does help. They speak one to the other. They're speaking to each other at the same time. They do help, but I don't see why you would need both. I think it's redundant. I want to circle back. I know we've kept you a long time. It's been really helpful. Just back to this question of you had characterized in your brief, as I mentioned, again and again, that the major point of 14 is that Congress wants to get a proxy for average acquisition costs. And then you mentioned in some of this argument about jurisdiction, you mentioned that was a whole point. That's why the drug piece got taken out and created separately. Do you have a citation for something? Because I don't see it in that brief, the overarching. And I don't see it in the text necessarily. And clarity that we need for jurisdiction stripping. How do we know that that's what Congress was up to? I think it's in the GAO 2006 report. And it's discussed in the earlier reports just as the background of this 2003 amendment. But not in a committee report or something more like non-post hoc and non-executive. I mean, I think it was understood. And it may well be in the legislative history. But the one thing, again, I just want to go straight to the text. We know from the primary directive in 14 that says HHS set the price, that sets the Medicare rate at average acquisition cost that Congress wanted to set the Medicare rate at average acquisition cost. We don't need additional legislative history beyond that text to know that was Congress's overriding objective. And then the only question is is your only means for adjusting the proxy to gather information through a survey regardless of how reliable the source might be for a particular subset of hospitals. Because one way to look at it is, I mean, not to make it arrogant for you, but I assume that this is where you're getting at and not to say that this is efficient. But which is that sub one refers to the average acquisition cost. Sub two refers to acquisition cost data. And so I think what you're saying is even if you don't have the data, the way it's structured is that you're still trying to get to the cost. Yes. The touchstone is cost. And price is a proxy for cost. Yes. Even if you're lacking the acquisition data, then you have different data. You have price data. Yes. And then price data can be adjusted to get closer to what one tries to get to in the first instance, which is the primary objective, which is cost. That's the way you're looking at it. Exactly. Yeah. Okay. Going back to one thing you said, which is we're not supposed to be doing statutory construction. Are we supposed to, in just paragraph 12, the limitation on judicial review, are we supposed to do statutory construction in interpreting paragraph 12? I understand the court has to, but... We're supposed to do statutory construction there. Yeah. No. And I understand the court has to... Do ordinary rules of statutory construction or not ordinary rules of statutory construction just for paragraph 12? I think it's important to understand   Ann-Jen made, which is that it is a quagmire. If you do, you know, what age, what gender, what age group, what age group, what age group, this first decision in this case recognizes you have to do. Wait until after the fact, get a concrete claim, have years of litigation, and then try to unravel threshold factors that went into the rates that is wholly unworkable. And so when you understand that, then you understand when you're interpreting paragraph 12 why Congress   provisions. So it's ordinary rules of statutory interpretation, but the important one is to understand why this preclusion exists. And I think it's important to understand why this preclusion exists. And we, to get to your big why, do we use ordinary rules of statutory construction as well? Well, that means what this court recognized in Ann-Jen as it's unsurprising that Congress has these broad overlapping preclusion provisions given that you've got a system that processes 100 million claims in a year and a budget neutrality requirement and no practical means to unravel the transactions once done. So I'm still trying to figure it out because again there's been this Chevron application here or difference. So, in interpreting paragraph 12 we are  to just look at statutory text but we are supposed to As in Ann-Jen Ann-Jen was talking about consequences like I said but I don't think it was saying courts stop doing statutory construction. Well, I don't think those are alternatives. If you're asking the question If in fact we're supposed to jettison ordinary rules of statutory construction because this was a mess how do we enforce the rule that we expect bars on judicial review to be clearly stated? So that rule just doesn't apply here? I don't read that Ann-Jen because The bar on judicial review there shall be no judicial review under the Medicare provisions or otherwise of all of these things is clearly stated. And the reason for that bar Well, there's an of. No, I understand. There's no judicial review of and then there's a list of five things which does not include everything under this OPPS provision. What it doesn't include are the types of things that you would imagine being raised in the context of a concrete claim that don't have to do with generally applicable issues. So you come in with your concrete claim and say wait, you like only reimburse me for five of my treatments not ten or you drop to zero or something like that. That's that is what goes through administrative review and that's why it's after the fact in connection with a concrete claim. The cross-cutting issues that get set in a hurry up front We have a concrete claim here. They did what you argued for. We told them to do go make concrete claims. So we're at the concrete claim stage. Yes, and the question is what did Congress leave room to challenge at that stage? And it's the computation issues the documentation issues. It's not the cross-cutting issues that if you were to say it's one thing for Congress which amends the statute all the time to come in and say I don't like the way you're running this. I'm going to make this sweet. Which as I said it does almost every year. For a court to do that after a hundred million claims have been processed that really is unworkable. And when Amgen said it's unsurprising that Congress precluded reviews so broadly given the unworkability of the alternative that's not dispensing the tools of statutory construction. That's like the Supreme Court's decision in King which said we're not just looking at the text in isolation. We have to understand what Congress was getting at. And here what Congress was getting at is that it's going to be too hard to unravel it down the road. All right. Why don't we hear from the other side and then we'll give you time for rebuttal. Thank you.  please the court. My name is Bill Schultz and I'm arguing for the appellees. The basic problem with the Congress is that Congress is  in paragraph 14 of the statute. And that's the methodology that controls whether the 30% reduction at issue here is lawful. As the court has discussed, there are really two possible methodologies that HHS can use. The first one is in sub clause one of the statute. And here the payment would be based on acquisition costs. HHS would look at the hospitals and see what they were paying to acquire the drugs. The Congress was quite specific about when acquisition costs could be used. Namely, only when there was a survey done that met very specific requirements. And so in sub clause one, you have to have a survey that has a large enough sample to be statistically significant. And the government admits that it couldn't do this. It did not meet this requirement. And in fact, it's not using sub clause one. And that leaves sub clause two as the basis for setting the standard formula that HHS uses across Medicare and other programs to pay for drugs. And the idea is for each drug there's a national price that looks at what the drug company is selling for and it takes into account various discounts and rebates to get to a fair price. Now, the sub clause says that that price may be adjusted as necessary for purposes of this paragraph. And I think that's really the issue in this case. And I want to talk about what that means. But there's one thing it does not mean. It does not mean that the average sales price plus six percent can be adjusted to be converted into a rough estimate of acquisition costs. And we know that because to do that would violate clause one which plainly requires more than a rough estimate. So can I ask you this then? Suppose that two said if hospital acquisition cost data are not available, the average price for the drug as a proxy for acquisition costs in the year established. If it just said explicitly that price is a proxy for acquisition costs, then your entire argument on the merits goes away. I don't think so. I think you will resist the premise. I'm not just resisting the premise. I think you still maybe I'm not quite getting the change. The change is that the whole purpose of two is to use price as a proxy for acquisition costs. It just makes more explicit what the government thinks is implicit. Let's just buy that premise. If you do that, the adjustment was designed to get price closer to acquisition costs. I don't think anybody in the legislative history and somewhere in the statute that if you're going to use acquisition costs, you have to do it exactly this way. If you don't have that, then we want you to do it another way because we think that's the best way to get close to it. You still have to use the requirements in sub cause one and sub cause two. Interestingly, the beginning of sub cause two it starts out and it says if acquisition cost data are not available. So Congress twice was telling HHS if you want to use acquisition costs, this is how to do it. I think the implication here is they were concerned that they did not want to get it wrong. Essentially, the Secretary's saying is we can interpret this to approximate acquisition costs to really do almost whatever we want. And sub cause one and sub paragraph D  irrelevant. Even if it were written the way it was proposed, I think it's an independent argument and I'm just curious how the HHS does not have authority to treat 340B providers differently from other providers and I gather this goes to this notion that it's pricing for the drug, drug by drug, not hospitals or classes of hospitals at least when you're under sub clause two. We do make that argument. Under sub clause one Congress explicitly said do the survey, do the survey, and then after you do the survey, depending on your data, you can have different acquisition costs for different classes of hospitals. Sub clause two is a national price. What would be the point? I don't understand this aspect. What would be the point of denying the agency ability to tailor price by hospital group if it's available to do? Why would you force a uniform price across the board if it's not getting to the price that's relevant? If there's a price that's out of whack with some particular group of hospitals,  Congress want to do that? Because of what average sales price is, I keep repeating myself, it's a national price. So I think in Congress's mind, the reason they didn't specifically give them the utility and sub clause two is just not the way to tailor the sales price necessarily across the board. If the secretary has the ability to make an adjustment that more carefully tailors the price to something that's low price, why would Congress not want it? I think the reason Congress passed 14 D, they were worried that if acquisition costs were used, HHS would underpay. So they were very specific. They said if you use acquisition costs, GAO, the controller general, was to do two surveys of those costs. There are three separate reports to Congress of the surveys and once the secretary identifies the acquisition costs of the   subsections, acquisition costs clearly is harder to come by. So I think Congress is very specific in the statute about what you need to do. Tell us a little bit more about the availability of the data. It would help me understand the logic of the two different subsections. Acquisition  clearly is harder to come by because the average sales price, you're looking at market data, and the acquisition costs, you're actually having to hold people and pick up all kinds of rebates, discounts, volume, deals. I mean, I'm just guessing. Tell us a little bit more about what the risks are. So, average sales price is something that's just out there because it's there for a lot of other reasons. It's calculated every year and it's an effort by the government to get as accurate as they can to determine what the average price is across the country. This is a price that takes into account what consumers are paying at pharmacies, what doctors are paying, what hospitals are paying. There's an effort to take into account rebates and special deals. So, this is calculated independently of 14 subsections? Yes. It's out there. It's independent. And is it it would be slightly percentage wise, slightly depressed given the existence of the 340B program? Actually, the statute takes 340B out of that calculation. So, there's a Only? Or other kinds of discounts and rebates? Well, I have to look, but it takes 340B out, 340B discounts out. Because of what you're saying, it really wouldn't be very fair. Right. 340B was a program, as you know, that Congress enacted. It's really off budget. It doesn't cost the government any money. And they figured out they required discounts to be given to community health centers and non-profit hospitals that disproportionately serve the poor. And the idea was that this money would then be used to provide better services at those hospitals. But it's not part of the budget, and so, you know, I think that would explain more. So, 340B is taken out of that. I'm sorry. I was just going to ask about 340B. I mean, when I first looked at the first case I ever had about 340B, I thought there are two benefits to these hospitals that serve the poor that might come from 340B. One is a lot of the people that they serve are uninsured, and so you're actually having to give them more   so, 340B is associated with this additional sort of profit, if you will, not profit, but pool of money that comes through the Medicare reimbursement, and it's just a little odd to think that 340B meant to both get a benefit from the Medicare and Medicaid for the people who are insured, and so you would think, well, the government just wants to save money, so it's going to say when people are insured we're not going to extra pay you. Yeah, when they're uninsured use these cheap drugs, but when they are insured why should we be  them   insurance that they need? And so that's what the baseline was. You know, we've been treating 340B as not only a cheap drug source, but also sort of a cash source for these other uncompensated funders. Is that anomalous under Medicare? Do you see that? Yeah, I think it's best to think of it as not under Medicare. It's a standalone program. But the thing we're arguing about here is a payment on Medicare. I know you're arguing it's status, the right way to think about it, is that it's treated as a full-price drug and that the increment between the actual pay and the price reimbursed at least if they haven't done the study under Roman I, its status is as a source of cross-compensation and that you're comfortable with that. And that's certainly something Congress has been well aware of for decades. I mean, look, HHS is free to go to Congress and argue about the 340B and make a lot of the policy arguments to make it here. But that's not what they're doing here. They are trying to use statutory authority to essentially take away the benefit of 340B and spread it out. They still have the benefit of cheap drugs to people who aren't insured. They still have the benefit of having cheap drugs available to give to people who are uninsured. They're just trying to  people to use Medicaid and other patients. But in order to do that, they have to qualify under their statute. They have to show they're entitled to make the adjustment of 30 percent. In addition to what I talked about before, there are three other problems with the statute. And the first one is this wasn't an adjustment of the average sales price or the 6 percent overhead. And it's really pretty clear in the statute. This wasn't a tinkering with the average sales price. Let's add this rebate. They subtracted a big amount rather than adding a small amount. They didn't actually start with that. They start with the adjustment. And they say we're going to yes. And you can see this. The first Federal Register notice in July of 2017, this is page 33, 634, but they say in the first column they say we don't have the acquisition cost data. We know that. And therefore we're going to use our adjustment authority. And then in the second column on the same page they say for separately payable drugs that are acquired under 340B, we're proposing ASP minus 22.5 percent, which we believe better represents the average acquisition cost for these drugs. So they were very upfront about it. This isn't an adjustment of the average sales price. It's a deduction. It's a percentage of it. Not to make the sales price more accurate, but for these drugs to take into account. They've been candid about that the whole time. They read the statute as being about approximating acquisition costs. And so if you buy that, there's nothing that does violence to subsection 2 in characterizing the adjustment of the average sales price to come close to acquisition costs. Right. I mean, you would have to abide that they can the adjustment of the sales price is really for something else. I understand what independent work the word adjustment is doing with respect to this argument. If you buy the premise that it's okay to try to shift price to get it closer to acquisition costs, then it is an adjustment that's getting it closer to acquisition costs. You know, I guess that's a fair way to look at it. I would say that it's worth looking in the past when they've used this adjustment authority, and they've only used it to adjust the 6% overhead costs. And the statute, I think it was discussed in the earlier argument, the statute has a whole study and discussion in subparagraph E about overhead costs, and it talks about an adjustment of overhead costs. And I think it's probably a fair reading of this adjustment authority in subclause 2 is that it's really just for overhead costs. But why have E then? Because if E's already there for adjustments that are related to overhead costs, what is the word adjusted in subparagraph 2 doing? Well, E has a lot more because it talks about a  this group called MedPAC to try and see what the fair costs were. Right. And so I think your argument on the merits would say that under E it has a bunch of provisos about how you're supposed to do adjustments related to overhead costs. So if you're going to do an adjustment related to overhead costs, you have to go through E. Right. Which that makes sense to me. But then that seems to leave the question of what is adjusted doing in sub 2? What do you think that authority allows the agency to do? I can see somebody writing this in subparagraph 2 and they say ASP plus 6 wanting to say, well, we want to make sure that you can use E for those kinds of adjustments. So we said that adjusted for purposes of this paragraph. I realize it may be too stark. So suppose that's an argument and let's just suppose that I disagree with that and that I think adjust needs to do something other than just refer to what's already accounted for by E. What would that independent thing be? Or do you think that it only refers to E? I mean, I have to say that it actually has to be to make the sales price across hospitals more accurate. The other What's the text that allows you to say 340B is not included in average sales price and that's not in the adjustment? That's somewhere else? So sub clause 2, the way we get to average sales price is that sub clause 2 has a reference to section to 3 sections in 1395 and I believe it's 1395W-3A. That's the definition of average sales price and I believe and I'll go back and check it, but I believe that it actually takes out 340B. Doesn't that result in a little bit of mismatch? I hadn't followed that through in the way that you are, but it seems a little anonymous to say that average sales price by definition excludes 340B, but then the way you read the statute is for 340B hospitals, you have to use average sales  by definition to generate this extra money outside the appropriation process for hospitals to use. It's been true since 1992. Nobody questioned it until this decision was challenging. These are all very reliable and carefully obtained information. It may not fit the Roman I survey requirements, but they have very reliable and concerning data for them about extraordinary overpayments to 340B hospitals. And not disputing that the extra money is used by those hospitals for good purposes, if Congress wants that, you can do it under the 340B statute. The point of Medicare is not to subsidize the 340B program. Why is it not within their authority under adjustment? What forecloses their adjustment authority when you read all of paragraph 14? And when you read      and this is one acquisition process, this is how you do it, what precludes them from doing it? And what precludes  from doing it? And I think it's just very hard to read this statute, you know, if you read the sections of it, without coming to that conclusion. In terms of what they're supposed to do, if they're unhappy, if they think there's an opportunity here for them to get some more money into Medicare, I would say at the expense of the hospitals, they have a different view, they should go to Congress. That's what they should do. If they can do that, we'll see if they're able to do this. But really what they should do is get some more money into Medicare and get some more money into Medicaid and get some more money into Medicaid and get some     and get some  money into  and get some more money into Medicaid and they should go to Congress. AUDIO INSTRUCTOR CLAIRE SH være LEYEI H e i M ER A d M E R A M E   M E R A  E R A M E R A M E R A M E  A M E R A M E R A M E R A M  R A M E M E R A  E R A M R A M E   M E
judges: Srinivasan, Millett, Pillard